DAVIDOFF HUTCHER & CITRON LLP                     *Hearing Date: 4/2/20 @ 10:00 a.m.*
*Attorneys for AJM Capital II, LLC*
605 Third Avenue
New York, NY 10158
(212) 557-7200
Robert L. Rattet, Esq.
Jonathan S. Pasternak, Esq.


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
In re:                                                      :   Chapter 11
                                                            :
AL YEGA LLC,                                                :   Case No.: 20-10383(SHL)
                                                            :
            Debtor.                                         :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MOTION OF AJM CAPITAL II, LLC
## FOR (I) DISMISSAL OF THE CHAPTER 11 CASE, OR
## (II) IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY

AJM Capital II, LLC ("AJM"), by its counsel Davidoff Hutcher & Citron LLP, as and for

its motion (the "Motion") seeking entry of an order, (i) pursuant to 11 U.S.C.§ 1112(b),

dismissing the above-captioned Chapter 11 case (the "Chapter 11 Case") of Al Yega LLC (the

"Debtor"), or, (ii) in the alternative, vacating the automatic stay, pursuant to 11 U.S.C. § 362(d)

to permit the County of Nassau to record the Tax Deed (as defined below), respectfully represents

as follows:

### INTRODUCTION

1.      The Chapter 11 Case, filed in the wrong venue, is "dead on arrival" with no hope

or possibility of a reorganization by Debtor, has all the indicia of a bad faith filing, and does not

belong in bankruptcy.  It is a desperate attempt and last-ditch effort by Debtor to preserve its

tenuous ownership of the property located at 435 First Street, Village of Mineola, Nassau County, New York (the "Property") and profit on a token investment in what can only be deemed a 'get rich quick' scheme.  On the eve of the filing of the Chapter 11 Case, the County of Nassau (the "County") was set to record a tax deed ("Tax Deed") in favor of AJM for the nonpayment of approximately $3.27 million in delinquent taxes (dating from tax year 1994 through and including tax year 2019) in accordance with the AJM/County Amendment (defined below) which Debtor had been attempting to avoid paying on an alleged subtle technicality, notwithstanding the fact that such taxes were rightfully assessed and are justly due and owing (as recently confirmed in a decision in the pending litigation in the State Court Action (defined below)).  Additionally, if not for the Chapter 11 Case and the corresponding automatic stay, the Debtor would have been on the hook to satisfy approximately $1.725 million in Village of Mineola (the "Village") tax liens on or prior to March 5, 2020 as follows:  (i) $48,785 owed to AJM regarding Tax Lien Certificate #29 for Village tax year 2010-11; and (ii) approximately $1.676 million regarding twenty-three (23) tax lien certificates held by the Village.  Since its "luck ran out" in the State Court Action, rather than exercise its simple remedy of paying such taxes to preserve its ownership of the Property, Debtor filed the Chapter 11 Case to stay the recordation of the Tax Deed and enforcement of the aforementioned Village taxes in (i) and (ii) above.

2.      In the Rule 1007 Declaration delinquently filed by the Debtor, it has admitted that it is not seeking to reorganize but rather is seeking a sale of the Property free and clear of millions of dollars of secured debt despite the Property having an admitted value, according to the Debtor, of $4.5 million[1] (notwithstanding that such value has been provided based on an alleged Broker's Price Opinion, a copy of which was not provided, as opposed to an appraisal).  Neither AJM, nor,

---

[1] As further detailed herein, AJM obtained an appraisal which provides for a value of the Property of $2.5 million.

upon information and belief, the Village, the County, or the EPA (defined below), consents to a 363 sale for the reasons set forth below. The Chapter 11 Case therefore does not belong in this Court as the Debtor has a very simple remedy - pay the real estate taxes that are due and owing to preserve its purported ownership. More disturbing, since the Debtor allegedly acquired title to the Property by quit claim deed for token consideration subject to all liens and encumbrances in March, 2019 from the prior owner of the Property who is responsible for creating the financial, physical and environmental mess at the Property, the Debtor has NEVER paid any real estate taxes or water bills, and upon information and belief, has not paid any debt service, maintained insurance[2], or undertaken anything associated with the required maintenance, security, upkeep and, most importantly, required continued mandated environmental remediation the Property desperately requires.

3.      The Property is hopelessly "under water", being subject to more than $5.8 million in delinquent real estate taxes which constitute statutory liens on the Property (arising from the Property being off of the active tax rolls for **30 years**), an approximate $8 million EPA environmental lien, approximately $1 million in response costs incurred by NYSDEC, and 1 unsatisfied mortgage of record[3] totaling $750,000 in outstanding principal (plus years and years of accrued interest). Real estate taxes (annual real estate taxes for the Property are approximately $100,000) and interest on all of the aforementioned liens continue to accrue. As admitted in the Rule 1007 Affidavit and at the 341A meeting, the Debtor has no operations, no employees, no cash

---

[2] Debtor admitted at the 341A meeting of creditors that it did not obtain insurance for the Property at any time from its acquisition through the filing of the Chapter 11 Case and only bound such coverage after being mandated by the U.S. Trustee. Additionally, the Debtor was advanced money by a third party without Court approval to procure such insurance.

[3] The Debtor testified at the 341A meeting that all mortgages of record have been satisfied; however, subsequent to such meeting, Debtor's counsel provided an alleged satisfaction for the $2 million Norstar mortgage but now acknowledges that it does not have a satisfaction for the $750,000 purchase money mortgage in connection with the acquisition of the Property by MVBRI (defined below).

and no ability to pay for ongoing insurance, real estate and other taxes, security, maintenance and the necessary environmental remediation. Further, the Debtor admitted, both in its Schedules and at the 341A meeting, that it borrowed money to purchase the Property and bind insurance coverage, and that the retainer for bankruptcy counsel in the Chapter 11 Case was paid by an entity controlled by the manager of such entity (not the member).

4.    The Debtor certifies, under penalty of perjury in Question 11 on its Petition, that, "*Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days in any other district*"; however, by its own admission in its Schedules and for the other rationale below, this statement is undoubtedly false. The Debtor has further demonstrated bad faith by filing its Chapter 11 Case in this Court instead of before the proper venue of the Eastern District of New York, where the Property, in a dilapidated and unmaintained state of disrepair and hazard, is situated and all of the taxing authorities and governing municipalities are located. The Debtor attempts to invoke the venue of this Court by (i) having retained a "property manager" to maintain the "books and records"[4] for the Property in February 2020 as admitted by Debtor in its Rule 1007 Affidavit, which is curiously timed with the filing of the Chapter 11 Case and (ii) stating that the manager of Debtor resides in Manhattan. Such property manager apparently rents a desk at a Corporate Suites (a provider of shared offices similar to Regus) office in Manhattan, despite the Debtor having no operations, employees or ongoing business affairs and despite the fact that the Debtor, in the State Court Action against, inter alia, AJM, in September 2019 claimed its principal place of business is located at 176 Jefferson Avenue, Third Floor, Roslyn Heights, New York!

---

[4] Following a review of Section 3(C) of Debtor's Rule 1007 Affidavit, it's curious what 'books and records' are maintained as the Debtor acknowledges no anticipated cash receipts or disbursements within the next thirty (30) days.

Further, the quit claim deed in which Debtor claims ownership of the Property provided the Roslyn Heights address for the Debtor. A logical inference can be made that the books and records prior to the filing of the Chapter 11 Case, if maintained at all, were maintained within the jurisdiction of the Eastern District of New York. Additionally, when the Debtor was organized with the New York State Department of State ("NYSDOS") on March 5, 2019, the address for process was the aforementioned Roslyn Heights address and Nassau County was designated as the county the Debtor would operate in. A certified copy of the Articles of Organization for the Debtor[5] filed with NYSDOS is annexed hereto as Exhibit "A". Debtor changed its address for process to the Manhattan address and amended the county that the Debtor operates in to New York County on February 10, 2020, *the same day as the filing of the Chapter 11 Case*. A certified copy of the Amendment to Articles of Organization for the Debtor filed with NYSDOS is annexed hereto as Exhibit "B". This is all indicia of the Debtor's bad faith and perhaps worse…perjury.

5.      More disturbingly, the Property is in a dilapidated and deteriorating condition which requires immediate securing to the building and remediation to the land below due to significant environmental contamination. The Debtor, despite knowing this, failed to check the box in Question 12 on its Petition that the Property is in need of immediate attention. The Debtor further failed to initially notice and/or schedule the environmental agencies and all lienholders of record of the bankruptcy and only attempted to do so after having been pointed out by undersigned counsel to AJM at the 341A meeting. The Debtor has no ability or prospects to reorganize or sell the Property free and clear of the many and substantial liens and encumbrances recorded against the Property. The Chapter 11 Case has therefore arrived stillborn, with no possibility of being revived. The Debtor's sole asset, the land and building located at the Property, sits as a vacant and

---

[5] Based on a search of the records of the NYSDOS, Debtor has not complied with the publication requirement set forth in New York Limited Liability Company Law Section 206.

5

abandoned lot with a dilapidated and deteriorating old building, rendering the Property an eyesore for the Village, the Nassau County seat. The building thereon is uninhabitable and unsuitable for possession without (i) significant renovations to restore the building (estimated in excess of $2 million in the Appraisal (defined below)) which require approval by the Village, (ii) approval by the United States Environmental Protection Agency ("EPA") and New York State Department of Environmental Conservation ("NYSDEC") as set forth in the Notice to Successors in Title filed by the EPA (a copy of which is included in Exhibit B of Exhibit "I" annexed hereto), (iii) satisfaction of their respective debts, and (iv) zoning and other municipal approvals from the Village as the existing warehouse building is a use in violation of the Village's zoning code.

6.      The Debtor has not paid ANY real estate taxes on the Property since its acquisition nearly one (1) year ago. In fact, upon information and belief, the only action taken by Debtor with respect to the Property is the filing of the State Court Action and the Chapter 11 Case. Real estate tax delinquencies dating back to the predecessor owner[6], who contaminated and then abandoned the Property and disappeared from sight years ago - *for more than 30 years* - only to allegedly reappear out of the woodwork to deed the Property to Debtor for $50,000 without satisfying a penny owed to any of its creditors – likely a fraudulent conveyance which further puts the Debtor's legitimate ownership of the Property into question. To the contrary and to preserve its interest in the Property, AJM recently satisfied three (3) Village tax liens held by third party lien holders in the aggregate amount of approximately $137,000[7]. Two (2) of such liens were the subject of foreclosure actions (referenced in the Debtor's schedules as "resolved" litigation). Although Debtor was served in such litigation, AJM, not Debtor, satisfied such liens.

---

[6] The predecessor owner, M.V. Barmed Realty, Inc. is an inactive corporation dissolved by proclamation on September 29, 1993. Refer to Paragraph 20 in this Motion.

[7] For clarity, the total outstanding delinquent tax figures provided herein exclude the 3 satisfied Village liens referred to herein.

7.      The Debtor has no significant creditors other than AJM, the EPA, NYSDEC, the County, the Village, and the mortgage holder of record – the real stakeholders of the Property. There are no operations, employees and no executory contracts or leases.  In short, there is no business to reorganize.  The Debtor's bankruptcy case serves no legitimate purpose and was filed in bad faith on the eve of the County's recordation of the Tax Deed in favor of AJM.

8.      The Property is admittedly unoccupied, vacant, and cannot and does not generate any income to service the secured debts or pay any  expenses as confirmed by the Debtor in the Rule 1007 Affidavit and as testified to at the 341A meeting.  Additionally, given the condition of the Property, it cannot be occupied until substantial renovations and remedial activities are made and prior to such work, approval shall be required by the Village, EPA, and NYSDEC.

9.      In fact, the Village has been forced to maintain and upkeep the Property at its own constituents cost and expense for many years and continuing through the present.

10.      The appraisal (the "Appraisal") of the Property dated as of March 4, 2020 prepared by Metropolitan Valuation Services, Inc., the largest independent commercial property appraisal and consulting practice for lenders and owners in the New York Metro area, concludes that the fair market value of the Property is only $2,500,000[8.]  A copy of the Appraisal is annexed hereto as Exhibit "C".  The aggregate secured claims of AJM, the Village, and the County alone exceed $5.8 million. In addition, the EPA lien, NYSDEC response costs, and mortgage encumbrance total another approximately $10 million.   Thus, even assuming the Debtor's unsubstantiated $4.5 million valuation, there is no equity in the Property, none of the secured creditors are adequately protected, and because the Property generates no cash flow, there are no funds available to service

---

[8] As stated in the Appraisal, it makes two extraordinary assumptions which are worth noting:  (i) that the Property is free of any environmental contamination (which is confirmed to not be the case) and (ii) that the Property can be used for light industrial/warehouse use despite that fact that the Property's underlying zoning does not allow such use.

any secured debt or make adequate protection payments thereon.

11.     In seeking to simplify the path of the opposing sides of this Chapter 11 Case and to determine the interests of the stakeholders for the Property – there is the Debtor on one side and AJM, the County, the Village, the EPA and the NYSDEC on the other.  Although tangential to the issues before this Court, the Debtor and AJM have very different business strategies.  The Debtor has sought to 'sail against the wind' creating a parasitic relationship and dispute the validity of real estate taxes assessed against the Property.  To the contrary, AJM, the Village, and the County have collaborated together to create a mutualistic relationship in which all interests are aligned to achieve the redevelopment of the Property.

12.     The Debtor allegedly obtained ownership of the Property by quit claim deed in exchange for the payment of token consideration to a defunct corporation (dissolved by proclamation nearly 26 years prior to the date of the deed) which party was responsible for the financial, physical, and environmental mess at the Property, which has been on a stain on the Village for three decades.  At the deed transfer "closing", the prior owner did not satisfy a dollar of monies owed to the County or the Village, and upon information and belief, any of its creditors, rendering the conveyance likely voidable if not outright void under New York Debtor and Creditor Law.  Rather than exercise its remedy of payment of the millions of dollars in delinquent taxes on the Property owed to AJM, the Village, and the County as further detailed herein, Debtor had been attempting to avoid paying monies owed on, inter alia, the County taxes on an alleged subtle technicality, notwithstanding the fact that such taxes were rightfully assessed and are justly due and owing as recently confirmed in a decision in the State Court Action.  Following such decision. which put quite a damper on the Debtor's plans, instead of exercising its payment rights, it filed the within Chapter 11 Case.

13.     Contrary to the Debtor's claim in its Rule 1007 Affidavit that the County and the Village will forgive all tax liens in connection with the transfer, AJM, on the other hand, with its proven track record as a partner of the County for almost nine (9) years, had been in negotiations with the County and the Village for a number of years with respect to the Property working towards a creative and unique three-way public-private partnership ("PPP") to allow for the Property to be redeveloped.   Shortly after such PPP was consummated, Debtor commenced the State Court Action.

14.     Against this backdrop, there is no possibility that the Debtor can propose a confirmable plan of reorganization around the Property.   Accordingly, the Property is not necessary to an effective reorganization.   Thus, in the event the Court declines to dismiss the Debtor's case, modification of the automatic stay is warranted to enable AJM to proceed to enforce its rights and obtain a Tax Deed to the Property from the County until such time as the Tax Deed is recorded, subject to the Debtor's right of redemption.

## BACKGROUND

### The Property and its Current Condition

15.     Assuming arguendo the Debtor lawfully acquired title of the Property and the Property is property of the Debtor's estate, the Debtor is a single asset real estate entity whose sole asset is the Property.   According to the Debtor's filed pleadings, the equity interests in the Debtor are allegedly 100% owned by Albert Yeganeh.

16.     Mr. Yeganeh, upon information and belief, owns no other properties or assets of any significant value and in fact resides at 176 Jefferson Avenue, Third Floor, Roslyn Heights, New York 11557 – the same address as admitted being the Debtor's "principal place of business" in the State Court Action and in the Debtor's original LLC filing with the NYSDOS.   The only

known recent employment AJM is aware of was Mr. Yeganeh's former employment as a shoe salesman at the Macy's retail store located in Manhasset, New York.  Upon information and belief, he has no experience owning, managing or developing real estate, especially environmentally contaminated commercial real property as is the Property at issue in the Chapter 11 Case and, upon further information and belief, has no income, capital or other financial wherewithal to protect, preserve, maintain, upkeep and remediate the Property, let alone pay ongoing real estate taxes, insurance or debt service as evidenced by the fact that he borrowed the money to purchase the Property and bind insurance on the Property following the insistence of the U.S. Trustee, and the retainer for bankruptcy counsel in the Chapter 11 Case was paid by Inwood Gate LLC[10], an entity controlled by the manager of the Debtor (not the member).

17.    According to the Debtor in pleadings filed in the State Court Action, the Debtor allegedly acquired fee simple title to the Property, subject to all open Village and County tax liens, encumbrances and judgments, pursuant to a quitclaim deed dated as of March 7, 2019 from M.V. Barmed Realty, Inc. ("MVBRI").  MVBRI, *a dissolved New York corporation*, was dissolved by proclamation on September 29, 1993, *nearly 26 years prior to the transfer of title to Debtor!*

18.    According to the Debtor, $50,000 was paid in connection with the Debtor's acquiring of the quitclaim deed and the Property and one hundred percent of the proceeds were borrowed by Debtor from its manager.  Such purchase price represents just (i) 2% of the value of the Property pursuant to the Appraisal, (ii) 1.11% of the value of the Property set forth in the Debtor's schedules, and (iii) 0.86% of the total tax delinquencies on the Property.

19.    MVBRI, the owner of record at the time of the discovery of the environmental

---

[10] Upon information and belief, Inwood Gate LLC is a single member LLC whose sole asset is a property located on Burnside Avenue in Inwood.

contamination and who remained in title and watched idly while the EPA and NYSDEC spent millions of dollars in taxpayer money cleaning up the mess created not only at the Property but at the adjacent daycare facility. MVBRI subsequently abandoned the Property, ceased paying School, General (i.e., County, Town of North Hempstead, and special districts), and Village real estate taxes in 1990 and such nonpayment has continued to date.

20.     The Property currently consists of a vacant warehouse situated on one and a half acres in the heart of the Village.

21.     The warehouse building was built in 1959 and is in a state of total disrepair and dilapidation. *See* attached Property Inspection Report prepared by AC&E Home Inspection Corp., a New York State licensed inspection company (Exhibit "D").

22.     For many years, including the past year of the Debtor's alleged ownership, the Village's Department of Public Works has been forced to maintain the Property in order to prevent the Property from becoming an even worse "eyesore" to the community. In fact, according to the Village, it has become part of the Village's routine general cleaning and maintenance program implemented to Village owned properties. Grass is cut by the Village weekly from April to November and snow is cleared from the adjacent sidewalks during periods of snowfall (despite the fact that all of such obligations are the obligations of the Debtor). According to the Village, the weekly maintenance at the Property requires 2 men, 1 pick-up truck, 2 lawnmowers, line trimmers and a leaf blower. The process takes approximately one-half hour per week. No one, other than the Village, has maintained the Property for many years.

23.     The real estate taxes for tax year 2019 for the Property aggregate $94,957.41, and the taxes for tax year 2020 are anticipated to be higher. Interest on the delinquent taxes continues to accrue in the mid six figures per annum.

MVBRI's Listing of the Property for Sale

24.    In the response to an inquiry submitted in a public comment period in connection with the Property in 2016, the EPA writes in pertinent part:

> "The property is listed in the title search as being owned by M.V. Barmed Realty, Inc., an inactive domestic corporation, which filed a proclamation for dissolution on September 29, 1993.    The president of Barmed was Mr. Charles Flynn.  According to a letter from Mr. Flynn, Barmed filed for bankruptcy in or about 1991 at about the same time that Jackson Steel Products filed for bankruptcy.  The major creditors were Applejack Farm, Inc., also a creditor of Jackson Steel, and Norstar Bank, which held the mortgage for the property.  Mr. Flynn stated in a letter to EPA that he had no interest or claim related to the property or Barmed when EPA filed a lien on the property on August 30, 2004."

25.    The Notice to Successors in Title recorded against the Property by the EPA states in pertinent part, "Because the record owners of the Property could not be identified to record a deed notice, EPA is filing this notice to successors-in-title to provide notice to any successors-in-title to provide information regarding the various restrictions on uses of the Property."

26.    Despite the fact that MVBRI was dissolved by proclamation in 1993 and seemingly vanished from the EPA, in or around October 2016, MVBRI listed the Property for sale with a broker for a price of $950,000.  The listing, a copy of which is annexed hereto as Exhibit "K", states in pertinent part, "This warehouse has been vacant for over 20 years and the property is being sold with outstanding tax liens, mortgages and an environmental clean up bill to be resolved".

27.    A Memorandum of Purchase and Sale Agreement dated as of October 9, 2017 was recorded against the Property to provide notice that MVBRI entered into a purchase and sale agreement to convey the Property to Jackson Steel BJM LLC.  Upon information and belief, although a termination was never recorded for such termination, Jackson Steel BJM LLC elected

not to proceed with such transaction.

28.    In or around early 2019, MVBRI reduced the price to $350,000.  A copy of the updated listing is also included in Exhibit "K".

The Validity of the Deed from MVBRI to Debtor Is In Question

29.    MVBRI, the grantor identified in the March 7, 2019 quit claim deed to the Debtor, is an inactive New York corporation dissolved by proclamation on September 29, 1993, almost twenty-six (26) years prior to execution of the deed.  While a dissolved corporation may take action to "wind up its affairs" (New York Business Corporation Law ("BCL") §1005(a) and BCL §1006(a)), the issuance of the deed twenty-six (26) years post-dissolution, in the absence of any other corporate activity or exigent circumstances for decades cannot be seen as a reasonable time period for winding up its affairs.  See, *Lance International, Inc. v. First National City Bank*, 86 A.D.3d 479 (1st Dept. 2011); *CM Realty Holdings Corp. v. DAC Holdings LLC*, 2019 N.Y. Misc. LEXIS 1843 (Sup. Ct. NY County - 4/10/19 - Index No. 657136/2019).

30.    Moreover, in light of the substantial secured and other debts asserted against MVBRI and the Property at the time of the Debtor's obtaining of the deed, the transfer in itself was likely a fraudulent conveyance, rendering the Debtor's interest in the Property void or voidable under, inter alia, New York Debtor and Creditor Law.

31.    The Debtor's interest in the Property is therefore in material dispute and tenuous at best.

Environmental History/Condition of the Property

32.    MVBRI acquired the Property by deed recorded on February 11, 1988. The Property was operated as a roll form metal shapes manufacturing facility until 1991, contaminating it severely.

33.     During the 1990s, the Nassau County Health Department ("NCHD") collected samples from on-site drywells which indicated the presence of contamination at depths down to 40 feet below grade.

34.     In 2000, the Property was listed on the EPA's Superfund National Priorities List.

35.     In 2001, NCHD conducted air sampling inside of the adjacent daycare center and billiards club which indicated that the indoor air exceeded the guidelines set by the NYS Department of Health; subsequently the EPA installed a system to remediate such contamination.

36.     In 2002, the EPA conducted sampling to determine that: (a) VOCs, SVOCs, pesticides and metal contamination were discovered in the surface soil and (b) VOCs contamination was discovered in several subsurface locations, including in a trench and sumps inside the building and dry wells under the parking lot, and in groundwater.

37.     In 2004, the EPA filed a Notice of Federal Lien to "secure the repayment of all response costs for which M.V. Barmed Realty, Inc. is liable" and finalized a remedial action work plan to address the contamination (see Title Report, Exhibit "I" herein).

38.     In 2009, the adjacent daycare center entered into an agreement with the New York State Office of Children and Family Services such that it would continue to address vapor intrusion as a condition of maintaining its daycare center license.

39.     In 2016, the EPA decommissioned the on-site ISVE system which ended the EPA's performance of remedial activities at the Property and filed a Notice to Successors in Title to "provide perpetual notice to any potential purchaser, lessee, or other user of the Property that EPA and NYSDEC must be notified if and when a determination is made that the existing building will be occupied or replaced with another structure" and sent a letter to the Village Department of Buildings requesting that the Village notify the EPA and NYSDEC of planned occupancy or

14

redevelopment of the Property. The Property was thereafter deleted from the EPA's National Priorities List; however, "residual levels of VOCs remain" and the EPA has determined that institutional controls requiring the continued operation of subslab vapor intrusion mitigation system is needed[11].

40.     Upon information and belief, the EPA is seeking to cede future parcel oversight to NYSDEC, which has listed the Property as a Class 4 site under its State Superfund Program and the NYSDEC has incurred approximately $1 million in response costs in connection with its oversight of the remediation at the Property.

41.     Upon further information and belief, the Debtor nor its member has made any attempt to contact the environmental authorities, the Village or County with respect to its plans to, inter alia, occupy, secure, remediate and/or improve or develop the Property.

42.     Notwithstanding the decommissioning of the Property by the EPA, the EPA lien and its underlying claim remain legally valid and enforceable.

43.     The Debtor incredulously scheduled the EPA's claim as unsecured and being in the amount of $0, with no disclosure or acknowledgement of the EPA lien filed as of record. It is anticipated that the EPA will be filing a claim and/or pleadings in the Debtor's Chapter 11 Case asserting, inter alia, the validity and amount of its secured claim, believed to be in excess of $8 million.

---

[11] It is important to note for the Court that while the Property was deleted from the EPA's National Priorities List, that does not mean that contamination does not still exist at the Property or that the EPA has waived its monetary claims. In furtherance of this point, the EPA and NYSDEC acknowledge that contamination remains at the Property.

The Village and County Tax Liens

44.     As a result of neither MVBRI nor the Debtor having paid ANY real estate taxes on the Property in more than 30 years and continuing to this date, the Village and the County have each sold numerous tax liens on the Property dating back to 1990.

45.     Annexed hereto as <u>Exhibit "E"</u> is a current schedule of outstanding and unpaid real estate tax liens on the Property along with bills provided by the County Treasurer and Village Treasurer.  Through tax year 2019, the Property is subject to Village tax liens totaling $1,702,952 (excluding current taxes) and County tax liens totaling $4,072,363 (excluding current taxes) for an aggregate outstanding amount, through 2019, of $5,775.315 (collectively, the "<u>Tax Liens</u>").

46.     For tax years 1991-1993, outstanding County taxes are classified as open taxes in the aggregate amount of $803,263.51.  For the County's Tax Lien (defined below), outstanding County taxes total $3,269,099.22.

47.     On February 21, 1995 pursuant to the applicable provisions of the Nassau County Administrative Code, as amended (the "<u>Code</u>") the Nassau County Treasurer ("<u>Treasurer</u>") held a tax lien sale for the unpaid 1993-94 Full School and 1994 Full General taxes regarding the Property (the "<u>1995 Tax Lien Sale</u>"). Inasmuch as there were no bidders at the 1995 Tax Lien Sale, the County became the successful purchaser, pursuant to the applicable provisions of the Code, and the Treasurer duly made, executed, and delivered to the County, a Certificate of Sale of Tax Liens No. 001301 dated as of April 24, 1995 (the "<u>County's Tax Lien</u>"), certifying, inter alia, that the 1995 Tax Lien Sale was held and that the County was the successful purchaser.

48.     Unpaid taxes following the 1995 Tax Lien Sale regarding the 1994-95 Full School and 1995 Full General taxes through and including the 2018-19 Full School and 2019

Full General taxes have been added to the County's Tax Lien.

49.    The County, as holder of the County's Tax Lien, pursuant to the applicable provisions of the Code, (i) served notices to redeem[12] to all interested parties in or around August 2011 and (ii) subsequently filed a tax deed application with the Treasurer on or about November 9, 2011 (the "Tax Deed Application").

50.    The Village, as holder of certain Village tax liens, pursuant to the applicable provisions of the New York State Real Property Tax Law ("NYSRPTL"), served notices to redeem to all interested parties regarding twenty-three (23) tax liens which were ripe for enforcement pursuant to NYSRPTL on or about August 13, 2019.  The outside date in the notices for payment of such tax liens was March 5, 2020.

AJM Held Village Tax Lien

51.    AJM is a secured creditor of the Debtor, being owed, in addition to the amounts owed under the Tax Liens, $48,785 regarding Tax Lien Certificate #29 for the Village's tax year 2010-11 previously assigned to AJM.    AJM served notices to redeem to all interested parties, including the Debtor, by (i) Certified Mail with Return Receipt, (ii) First-Class Mail with a Certificate of Mailing, and (iii) personal service, regarding such tax lien on or about August 6, 2019.  The outside date in the notices for payment of such tax liens was March 5, 2020.  A copy of the assignment transferring ownership of such tax lien to AJM is annexed hereto as Exhibit "F".

---

[12] The notice to redeem regarding the County's Tax Lien covered tax years 1994-2011.  Although the County's computer system automatically added tax years 2012-2019 to the County's Tax Lien unintentionally, such tax years are to be detached from the County's Tax Lien and maintained as open taxes with the Treasurer in accordance with the AJM/County Amendment.

AJM/County Agreement

52.     The County holds an annual tax lien sale for any properties with unpaid taxes for each such tax year.  The overwhelming majority of such tax liens are sold to third party investors; however, each year a subset of such liens is not sold.  These are the "dregs" - the liens that no one wanted – a portfolio so laden with problems ranging from environmental contamination to irregular lots to the possibility of protracted litigation and more, that many of the underlying tax liens went unsold for more than a decade.  Recognizing the probability that these tax liens would never be sold or paid without aggressive enforcement, the County issued a Request for Proposals ("RFP") on January 6, 2011 seeking potential buyers for the subject portfolio.

53.     AJM submitted a response to the RFP in which it proposed a creative arrangement, in accordance with the Code, in which AJM would obtain an assignment of such portfolio at no upfront cost to AJM given the questions surrounding the collateral of each tax lien (however, AJM would be responsible for all work, expenses, legal fees, etc.) in exchange for an allocation of collections on tax liens and 'profits' realized on the sales of underlying properties, as the case may be.

54.     Subsequently, the County and AJM entered into that certain Assignment and Transfer Agreement dated as of September 23, 2011 (the "AJM/County Agreement"; Exhibit "G"), which was passed by the Nassau County Legislature upon unanimous approval on September 19, 2011 and became a resolution on September 23, 2011 as Resolution No. 250-2011.

AJM/County Amendment

55.    With respect to the County's Tax Lien and the Property, Section 11 of the AJM/County Agreement provides in pertinent part that, "*if at any time the County and the Assignee* [AJM] *agree in writing to assign and/or transfer the aforementioned (i) tax lien certificate* [Property's Tax Lien] *or (ii) parcel* [Property] *via deed from the County to the Assignee or its Affiliate, said tax lien certificate or parcel shall be assigned and/or transferred subject to all of the applicable provisions of this Agreement*".

56.    The AJM/County Agreement has been an extremely successful PPP by all accounts. To date, it has generated revenues of approximately $10.65 million and such figure excludes the direct benefits the County realizes by the restoration of properties to the active tax rolls as well as the indirect economic benefits (e.g., sales tax, job creation).

57.    Following the issuance of two (2) RFPs issued by the County for the redevelopment of the Property, which AJM responded to, and the execution of the AJM/Village Agreement (defined below), AJM and the County entered into that certain Amendment to Assignment and Transfer Agreement dated as of June 10, 2019, which amended the AJM/County Agreement (the "AJM/County Amendment"; Exhibit "G"), which was passed by the Nassau County Legislature upon unanimous approval on May 20, 2019 and became a resolution on May 24, 2019 as Resolution No. 63-2019.

58.    Contrary to the Debtor's claim in its Rule 1007 Affidavit that the County will forgive all tax liens in connection with the transfer to AJM, the fundamental function of the AJM/County Amendment is that the County assigned the Tax Deed Application to AJM and added the County's Tax Lien to the AJM/County Agreement to allow for AJM to obtain title in and to the Property and remediate, redevelop, and revitalize the Property.  In exchange, AJM is obligated

to pay the County an allocation of the profits it receives from the Property from selling the Property.

<u>AJM/Village Agreement</u>

59.     Following several years of dialogue, AJM and the Village entered into that certain agreement as of April 3, 2019, which was unanimously approved by the Village's Board of Trustees on April 3, 2019, regarding the Property (the "<u>AJM/Village Agreement</u>"; <u>Exhibit "H"</u> to the AJM Motion) which created a public-private partnership between the Village and AJM, and subsequently a tri-party public-private partnership by adding the County, pursuant to the AJM/County Amendment to facilitate the redevelopment of the Property and its return to the active tax rolls and productive uses.  The fundamental function of the AJM/Village Agreement is that the Village will forbear from taking action on the Village tax delinquencies (not forgive them) to allow for AJM to remediate, redevelop, and revitalize the Property.  In exchange for such forbearance, AJM is obligated to pay the Village an allocation of the profits it receives from the Property either from leasing or selling the Property, an innovative structure that mutually aligns our respective interests.

<u>Other Liens and Encumbrances on the Property</u>

60.     Annexed hereto as <u>Exhibit "I"</u> is a title report for the Property prepared by Langdon Title dated as of February 28, 2020, evidencing, in addition to the Tax Liens, the following liens and encumbrances are of record and either unsatisfied or undischarged against the Property:

a.      Mortgage in favor of Joseph G. Page, John J. Beransky and Charles W. Thomas in the principal amount of $750,000 recorded February 11, 1998.  This mortgage has not been satisfied of record;

b.      Environmental Lien filed by the EPA dated August 24, 2004 in the

estimated amount of $8,000,000. The lien has not been satisfied of record; and

        c.        Notice to Successors-In-Title filed by the EPA on July 27, 2016.

61.      As a result of all of the foregoing, the Property is currently subject to liens and encumbrances aggregating *approximately $15,500,000*, together with years and years of interest, penalties and costs accrued thereon.

      State Court Action

62.      On August 1, 2019, Debtor filed a complaint in Supreme Court State of New York, Nassau County, captioned *Al Yega LLC v. County of Nassau, et al*., Index No. 610500/2019 (the "State Court Action") seeking to, inter alia, vacate the Tax Lien and the Tax Deed Application and obtain a declaratory judgment that the Tax Lien has expired for failure of the County to timely file a Tax Deed Application.

63.      Subsequent to the County furnishing written evidence of such timely filing, Debtor filed an amended complaint on September 11, 2019 seeking the same relief as above but then claiming that the Tax Lien has expired on a new technicality despite being rightfully assessed.

64.      By Short Form Order dated February 5, 2020 (Exhibit "J"), the State Court denied the Debtor's application for a preliminary injunction, vacated the TRO in place, and found that the County was the proper holder of the Tax Lien and was further permitted to merge subsequent tax liens into the Tax Lien, and that the Tax Deed Application was timely filed.

65.      Having essentially lost the State Court Action, on the literal eve of the County issuing and recording a Tax Deed in favor of AJM, the Debtor, on February 10, 2020, filed with this Court a "skeletal" Chapter 11 petition, with at least two glaring perjured statements, thereby automatically staying the recordation of the Tax Deed Application.

## **ARGUMENT**

**I.    THE DEBTOR'S BANKRUPTCY CASE SHOULD BE DISMISSED AS A BAD
FAITH FILING, WITH PREJUDICE AGAINST RE-FILING**

66.    Section 1112 of the Bankruptcy Code provides that a Chapter 11 case may be

dismissed "for cause." Subsection (b)(1) thereof provides as follows:

> "(b)(1) Except as provided in paragraph (2) of this subsection,
> subsection (c) of this section, and section 1104(a)(3), on request of
> a party in interest, and after notice and a hearing, absent unusual
> circumstances specifically identified by the court that establish that
> the requested conversion or dismissal is not in the best interests of
> creditors and the estate, the court shall convert a case under this
> chapter to a case under chapter 7 or dismiss a case under this chapter,
> whichever is in the best interests of creditors and the estate, if the
> movant establishes cause."

67.    It is well-settled that "cause" for dismissal purposes includes a filing made in bad

faith. *In re C-TC 9th Avenue Partnership v. Norton Movant (In re C-TC 9th Ave P'ship)*, 113 F.3d

1304, 1310 (2d Cir. 1997); *see also Baker v. Latham Sparrowbush Assoc. (In re Cohoes Indus.*

*Terminal, Inc.)*, 931 F.2d 222, 227-28 (2d Cir. 1991); *In re SGL Carbon Corp.*, 200 F.3d 154,

160-61 (3d Cir. 1999) (compiling cases); *In re Schur Management*, 323 B.R. 123, 126 (Bankr.

S.D.N.Y. 2005).

68.    The Second Circuit Court of Appeals has found the following eight factors to be

indicative of a bad faith filing giving rise to "cause" for dismissal:

a.    The debtor has only one asset;

b.    The debtor has few unsecured creditors whose claims are small in relation
to those of the secured creditors;

c.    The debtor's one asset is the subject of a foreclosure action as a result of
arrearages or default on the debt;

d.    The debtor's financial condition is, in essence, a two-party dispute between
the debtor and secured creditors which can be resolved in a pending state court action;

e.      The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

f.      The debtor has little or no cash flow;

g.      The debtor cannot meet current expenses including the payment of personal property and real estate taxes; and

h.      The debtor has no employees.

*See In re C-TC 9th Ave. Partnership*, 113 F.3d at 1311; *see also, In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394-95 (11h Cir. 1988); *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309 (Bankr. S.D.N.Y. 2001); *234-6 West 22nd St. Corp.*, 214 B.R. 751, 760 (Bankr. S.D.N.Y. 1997).

69.      The Chapter 11 Case must be dismissed because ***every single*** *C-TC* bad faith factor is present.  Specifically, (1) the case is admittedly a single asset real estate case; (2) there are limited creditors who all hold claims based upon liens or encumbrances against the Property and claims primarily against the prior owner; (3) the Debtor's sole asset, the Property, is the subject of the Tax Lien upon which a Tax Deed was about to be recorded the day of the filing of the Chapter 11 Case; (4) the Chapter 11 Case is essentially a two-party dispute between the Debtor and AJM which can and should be resolved in the State Court Action; (5) the filing was commenced on the eve of the scheduled recordation of a Tax Deed by the County; (6) the Debtor generates no cash flow, its sole asset lying idle and in disrepair and need of environmental remediation; (7) the Debtor cannot meet its current expenses including the payment of taxes and insurance on the Property; and (8) the Debtor has no employees.  Because every single *C-TC* factor is present, AJM respectfully submits that the Chapter 11 Case must be dismissed pursuant to Section 1112 of the Bankruptcy Code as a bad faith filing, with prejudice as to re-filing so as to not permit the Debtor to simply re-file for bankruptcy or, even worse, transfer the deed to the Property to another remote entity to further frustrate AJM's rights and continue the urgent problems plaguing the Property,

the County, and the Village.

## II.    IN THE ALTERNATIVE, THE MOVANT IS ENTITLED TO *IN REM* RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)(1) and (d)(2)

70.    If the Court declines to dismiss the Chapter 11 Case, AJM is entitled, in the alternative, to *in rem* relief from the automatic stay to allow it to proceed with the recordation of the Tax Deed Application. Section 362(d) of the Bankruptcy Code governs the automatic stay and the modification thereof.  The section provides, in pertinent part:

> (d)    On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay --
>
> (1)    for cause, including the lack of adequate protection of an interest in property of such party in interest.
>
> (2)    with respect to a stay of an act against property under subsection (a) of this section, if -
>
> (A)    the debtor does not have any equity in such property; and
>
> (B)    such property is not necessary to an effective reorganization
>
> 11 U.S.C. § 362(d)(1), (2).

71.    Sections 362(d)(1) and (d)(2) are disjunctive. This means that the Court must lift the stay if the movant prevails under either of the two grounds. *In re Elmira Litho Inc.*, 174 B.R. 892, 900 (Bankr.  S.D.N.Y. 1994) (citing *In re Touloumis*, 170  B.R. 825, 827 (Bankr. S.D.N.Y. 1994); *In re de Kleinman*, 156 B.R. 131, 136 (Bankr. S.D.N.Y. 1993); and *In re Diplomat Elecs. Corp.*, 82 B.R. 688, 692 (Bankr. S.D.N.Y. 1988)).  Here, AJM respectfully submits that it is entitled to modification of the automatic stay for cause under both sections 362(d)(1) and (2).

A.  **"Cause" Exists for Relief From Stay Pursuant to 11 U.S.C. § 362(d)(1)**

72.     In a hearing for relief from the automatic stay under Section 362(d), the party opposing stay relief bears the burden of proof on all issues (except the debtor's equity in the property under section 362(d)(2)(A)).  *See In re Domestic Fuel Corp.*, 70 B.R. 455, 462-63 (Bankr. S.D.N.Y. 1987); 11 U.S.C. § 362(g).  If a creditor seeking relief from the automatic stay makes a *prima facie* case of cause for lifting the stay, the burden of going forward shifts to the debtor pursuant to section 362(g).  *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 756 (Bankr. S.D.N.Y. 1997). *See also Elmira Litho*, 174 B.R. at 901.

73.     The term "cause" is not defined in the Bankruptcy Code, and whether cause to lift the stay exists should be determined on a case-by-case basis.  *See Sonnax Indus., Inc. v. Tri Component Products Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990); *In re Balco Ltd.*, 312 B.R. 734, 748 (Bankr. S.D.N.Y. 2004). The decision whether to lift the automatic stay is committed to the sound discretion of the bankruptcy judge and may be overturned only upon a showing of abuse of discretion. *See Sonnax*, 907 F2d at 1286.

74.     Here, the Debtor's bad faith in filing the Chapter 11 Case in itself constitutes cause to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(1). *See In re Kornhauser*, 184 B.R. 425, 428 (Bankr. S.D.N.Y. 1995); *Manhattan King David Restaurant, Inc. v. Levine*, 163 B.R. 36, 40 (S.D.N.Y. 1993). As more fully set forth above, it is clear that the Debtor's petition was filed in bad faith without a valid reorganization purpose and, accordingly, cause exists to vacate the automatic stay as it pertains to AJM.

75.     In *In re Kaplan Breslaw Ash, LLC*, Judge Gerber considered a similar set of circumstances and found the debtor's bad faith filing to constitute cause for stay relief.  In so doing, the court noted:

Here, under the totality of the circumstances, the Court finds this case to be indistinguishable in relevant respects from *234-6 West 22nd St.*, and applying criteria in that case and *C-TC TC 9th Ave. Partnership*, the Court concludes that this case should be dismissed for substantially the same reasons. Here the Debtor has only one asset, the Warehouse. It has no employees. It produces no income, and has no discernible cash flow. It has very few unsecured creditors (especially non-insiders), and none, so far as the Court can determine, that would be helped by a chapter 11 reorganization. (Indeed, the two largest unsecured claims-though recognizing the likelihood that they will overlap - are those of the Mortgage holder and Sterling, affiliates of each other who support relief from the stay.) The Warehouse is the subject of a foreclosure action as the result of arrearages on the Mortgage holder's secured debts. The case is essentially a two- party dispute between the Mortgage holder and the Debtor, and the timing of the Debtor's entry into bankruptcy (initially in New Jersey) has caused the Court to find as a fact that the Debtor timed its bankruptcy filing so that it could avail itself of the automatic stay in order to stop the foreclosure action.

*In re Kaplan Breslaw Ash, LLC*, 264 B.R. at 335.

76.     In addition, AJM's lack of adequate protection also constitutes cause warranting relief from the automatic stay.  Lack of adequate protection is specifically defined as cause under Section 362(d)(1).  Although adequate protection is specifically defined in the Bankruptcy Code, Section 361 lists three separate ways adequate protection may be provided to a creditor:

i.       cash payments or periodic cash payments;

ii.      replacement lien; or

iii.     granting such other relief, as will result in the realization of the indubitable equivalent of the creditor's interest in such property.

11 U.S.C. § 361.

77.    One bankruptcy court recently explained:

> The purpose of providing adequate protection is to insure that a creditor receives the value for which it bargained pre-bankruptcy. Adequate protection is, essentially, protection for the creditor to assure its collateral is not depreciating or diminishing in value … and is made on a case-by-case basis. The secured creditor "must, therefore, prove this decline in value-or the threat of a decline-in order to establish a prima facia case.

*In re Gunnison*, 320 B.R. 391, 396 (Bankr. D. Col. 2005) (internal citations omitted).

78.    The Supreme Court has stated that an "interest is not adequately protected if the security is depreciating during the term of the stay." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 370 (1988).

79.    In this case, no adequate protection has been offered by the Debtor because the Property generates no cash flow and the Debtor, a mere shell entity, has no ability or wherewithal to make such adequate protection payments. In the meantime, the Property is subject to continuous diminution in value because, in addition to the deteriorating state of the Property as described above to the condition of the building and the underlying environmental contamination, the Debtor has no income, cash flow, or unencumbered funds to pay the necessary expenses (including insurance, real estate taxes, maintenance, security, etc.) of the Property.  Indeed, as noted above, neither the Debtor nor its predecessor has paid ANY real estate taxes in more than 30 years, ongoing to this day, increasing AJM's and the other secured creditors' exposure and the Property's ever-increasing diminution in value.  Courts regularly grant relief from the automatic stay where the movant has demonstrated a post-petition diminution in the value of the collateral. *See e.g., LNC Invs., Inc. v. First Fidelity Bank*, 1995 WL 231322 at * 4 (S.D.N.Y. Apr. 19, 1995) (noting that methods of determining lack of adequate protection under Section 362(d)(1) "emphasize actual or likely diminution in the value of the collateral in the period between the petition and the plan");

*In re 160 Bleecker St. Assocs.*, 156 B.R. 405, 413 (S.D.N.Y. 1993) (reversing ruling of bankruptcy court and vacating stay because value of collateral had declined by $600,000 (from an appraised value of $1.6 million) over the course of one and a half years); *In re Domestic Fuel Corp.*, 70 B.R. 455, 463 (Bankr. S.D.N.Y. 1987) (granting relief from the automatic stay under Section 362(d)(1) where movant demonstrated decline in value of stock pledged by debtor and debtor failed to establish movant was adequately protected); *In re Armenakis*, 406 B.R. 589, 620- 21 (Bankr. S.D.N.Y. 2009) (granting creditor's motion for relief from stay upon the finding that secured creditor had proven decline or threat of decline in value of collateral and debtor had not offered any proof that creditor was adequately protected); *In re Grant Assocs.*, 1991 WL 21228 at *7 (S.D.N.Y. Feb. 5, 1991) (affirming bankruptcy court order terminating stay under section 362(d)(1) on the grounds that building securing creditor's claim was declining in value and debtor was unable to provide adequate protection).

80.     "Once the movant satisfies this initial burden, the burden shifts to the debtor to go forward with evidence, and ultimately, to prove that the collateral is not declining in value, or that the secured party is adequately protected through periodic payments, an equity cushion, additional or replacement liens or good prospects for a successful reorganization." *Elmira Litho*, 174 B.R. at 902 (citations omitted).

81.     The Debtor cannot satisfy its burden to show that the Property is not declining in value, particularly because the Property is not being maintained, secured or improved. No renovation plans have been submitted or approved by the Village.  Nor can the Debtor credibly argue that AJM is adequately protected, especially in light of the value of the Property being substantially less than, inter alia, the amounts owed to AJM on the Tax Liens, let alone the other significant encumbrances on the Property likely exceeding $11 million in the aggregate.

Accordingly, AJM should be granted relief from the automatic stay under Section 362(d)(1) of the Bankruptcy Code for "cause," with such relief being granted without an accompanying dismissal of the Chapter 11 Case until such time as the Tax Deed Application is recorded.  Otherwise, AJM requires in rem relief to avoid further interference and improper conduct of the part of the Debtor and/or its principal(s)[13].

**B.      Relief from Stay is Appropriate Under 11 U.S.C. § 362(d)(2) Because There is No Equity in the Property and the Property Is Not Necessary for an Effective Reorganization**

82.      AJM is entitled to relief from the automatic stay pursuant to Section 362(d)(2) of the Bankruptcy Code because there is no equity in the Property and the Property is not necessary for an effective reorganization.

83.      As reflected in the Appraisal, the value of the Property as of March 4, 2020 was at most $2.5 million[14] on a fair market valuation determined by an appraiser.  The Debtor's indebtedness to AJM, the Village and the County in the aggregate is over $5.8 million. The other encumbrances on the Property likely total in excess of $9.75 million. Accordingly, under any valuation scenario, no equity exists in the Property.

84.      Lack of equity is not necessarily fatal under Section 362(d)(2) if a debtor can prove that the property is necessary to an effective reorganization. *In re Steffens*, 275 B.R. 570, 578 (Bankr. D. Colo. 2002). But to succeed in that regard, a debtor must show that there is a reasonable prospect of a successful organization within a reasonable period of time.  *United Sav. Ass'n v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 375-76 (1988). If the debtor is unable to make such a showing, the court must grant relief from the stay.  See 11 U.S.C. §  362(d).  Here, it

---

[13] Given Mr. Yeganah's own financial distress and lack of capital, it is suspected that there may be other, silent partners behind the Debtor and the Chapter 11 filing.

[14] As stated in the Appraisal, it makes two extraordinary assumptions which are worth noting:  (i) that the Property is free of any environmental contamination (which is not the case) and (ii) that the Property can be used for light industrial/warehouse use despite that fact that the Property's underlying zoning does not allow such use.

is clear that the Debtor is unable to establish that the Property is necessary for an effective reorganization and that they cannot propose a confirmable plan within a reasonable period of time.

## **CONCLUSION**

For all the reasons set forth herein, AJM respectfully requests that the Court enter an order (i) dismissing the Debtor's Chapter 11 Case with prejudice against re-filing or, (ii) in the alternative, lifting, terminating or modifying the automatic stay to enable AJM, absent satisfaction of all outstanding tax liens, to record the Tax Deed Application, and grant AJM such other and further relief as may be just and proper.

Dated: New York, New York
        March 11, 2020


Respectfully submitted,

DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for AJM Capital II, LLC*

By: */s/  Robert L. Rattet*
    Robert L. Rattet
    Jonathan S. Pasternak
605 Third Avenue
New York, New York 10158
(212) 557-7200