DAVIDOFF HUTCHER & CITRON LLP          *Hearing Date: 5/7/20 @ 10:00 a.m.*
*Attorneys for AJM Capital II, LLC*
605 Third Avenue
New York, NY 10158
(212) 557-7200
Robert L. Rattet, Esq.
Jonathan S. Pasternak, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                                                  Chapter 11

AL YEGA LLC,                                                   Case No. 20-10383(SHL)



                              Debtor.
------------------------------------------------------------x

## RESPONSE IN FURTHER SUPPORT OF MOTION OF AJM CAPITAL II, LLC FOR (I) DISMISSAL OF THE CHAPTER 11 CASE, OR (II) IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY

AJM Capital II, LLC ("AJM"), by its counsel, Davidoff Hutcher & Citron LLP, as and

for its Response, inter alia, in further support of its motion (the "Motion")[1] seeking entry of an

order, (i) pursuant to 11 U.S.C. § 1112(b), dismissing the above-captioned Chapter 11 case (the

"Chapter 11 Case") of Al Yega, LLC (the "Debtor") or, in the alternative, (ii) vacating the

automatic stay, pursuant to 11 U.S.C. § 362(d), respectfully represents as follows:

## INTRODUCTION

1.      Rather than addressing the substantive and serious issues such as inability to

reorganize, lack of equity in the Property, administrative insolvency[2], inadequate insurance, failure

to provide adequate protection, bad faith filing, gross mismanagement and forum-shopping, the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings as set forth in the Motion.
[2] The Debtor's rebuttal to this claim in the Debtor's Opposition first appears on the 25th page (out of 29) and takes up approximately one-eighth of such page.

Debtor resorts to a blaze of random attacks on AJM, the County of Nassau (the "County") and the Village of Mineola (the "Village").  It seeks to vindicate random unfounded conspiracy theories, and demonstrates the adage "if the law is against you, argue the facts…if the facts and the law are against you, pound the table".

2.    Despite the Debtor's opposition to the Motion, whose responses are filled with inaccuracies, misstatements, and irrelevant, categorically false and defamatory allegations, the Motion needs to be granted now more than even before.  The Debtor is administratively insolvent. The Debtor has accumulated substantial post-petition tax liabilities which it admittedly has no ability to pay.  The Debtor has admitted it has no ability to reorganize.  Moreover, the secured creditors are not adequately protected.  The Property is not being maintained, environmentally attended to (despite mandates by the various environmental agencies), and is grossly underinsured all while the building continues to deteriorate.  The filing of the Chapter 11 Case and the Adversary Proceeding constitute blatant forum shopping as even admitted by the Debtor following the denial of the preliminary injunction in the State Court Action.  The Debtor is a sham corporation with no employees, cash, income, or operations which purportedly acquired the Property for a mere $50,000, hoping to make a windfall through ill-advised litigation which tries to incorrectly assert an alleged inapplicable technicality in an attempt to extinguish decades of taxes rightfully assessed and justifiably owed.  Despite the Debtor's blanket refutation, the Debtor actually meets *every* C-TC bad faith factor.  The operating statements submitted to date by the Debtor for February 2020 and March 2020, each filed delinquently (which the Debtor rationalized as being too busy to focus on such requirement due to other matters in connection with this Chapter 11 Case), admit the Debtor has no cash or income, the Debtor has borrowed money from insiders for all costs incurred by the Debtor prior to the filing of the Chapter 11 Case and the same insiders "gifted" money to

2

the Debtor following the filing of the Chapter 11 Case as unauthorized and disguised post-petition loans.  Additionally, the Debtor failed to disclose the post-petition taxes in either operating statement that are justly due and owing.  The Debtor retained a broker to market the Property prior to obtaining permission from this Court and accepted an offer to sell the Property procured by such broker.  Despite not having the right to do so, the Debtor seeks to go on an irrelevant discovery 'fishing expedition' purely to harass the secured creditors.  The Debtor most recently filed a motion for Summary Judgment in the Adversary Proceeding which AJM has demanded the withdrawal of as it was filed (i) prior to the defendants having filed answers, (ii) without permission from this Court, (iii) with a return date that was only nine (9) days following the filing date of the motion, and (iv) in violation of the stipulated briefing schedule that was 'So Ordered' by this Court.  In a telephone conference held May 1, 2020 this Court addressed scheduling issues, indicating that it would decide threshold issues of dismissal, jurisdiction and abstention prior to addressing, inter alia, summary judgment.

3.      Based on its reckless actions, the Debtor has shown that it has no respect for the creditors and even worse, the rules of this Court.  The Debtor (and its predecessor in interest) have *never* paid real estate taxes or interest payments on the mortgage still of record.  Accordingly, interest and taxes continue to accrue while the Property is likely further declining in value due to its abandonment of care by the Debtor, the current COVID-19 crisis, and the continued deterioration of the building located on the Property.  The Property is hopelessly "underwater".  In an attempt to deflect this Court's attention from all of the aforementioned issues with the Debtor and this Chapter 11 Case, the Debtor postures a fabricated, defamatory, and libelous smear campaign against AJM, the County, and the Village.

4.      Meanwhile, the Debtor claims to have an "offer" from an unidentified party to purchase the Property for $4 million. This amount is significantly less than the approximately admitted $6.5 million in tax and mortgage liens and secured claims, with the EPA likely to assert, inter alia, an additional "windfall" lien against the Debtor and/or any purchaser, and the NYSDEC likely to assert, inter alia, reimbursement of its response costs of $744,230[3], both further clouding title and the ability of the Debtor to sell the Property under § 363(f) of the Bankruptcy Code. The offer itself is nothing more than a 70-day option subject to due diligence and termination by the purchaser at any time for any or no reason during such 70-day period. Even assuming the purchaser were to satisfy the due diligence contingency, the Debtor would then require additonal time to seek (i) approval of a contested sale motion and approval process and (ii) to be able to convey marketable title in light of the issues of the deed to the Debtor. Meanwhile the secured creditors are not being adequately protected and the Debtor continues into further administrative insolvency. Yet the Debtor seeks to extend the Chapter 11 Case indefinitely on the backs of its secured creditors. All of these factors should lead the Court to conclude that more than sufficient cause exists both under 11 U.S.C. § 1112(b) and § 362(d)(1) and (2) to immediately either dismiss the Chapter 11 Case or lift the automatic stay to avoid continued irreparable harm and prejudice to the legitimate, non-insider creditors of this estate.

5.      AJM hereby incorporates the Motion herein by reference and wishes to not recite or restate all of the material facts therein.

---

[3] Pursuant to counsel to NYSDEC, the NYSDEC has (i) reimbursed the EPA in the amount of $261,230 for the NYSDEC's allocation of costs incurred by the EPA pursuant to the State Superfund Contract (as set forth in the letter dated as of November 6, 2017 from EPA to NYSDEC annexed hereto as Exhibit "A") and (ii) $483,000 in additional State response costs, for a total of $744,230 spent in connection with the remedial activities performed at the Property.

4

6.      The Debtor's opposition to the Motion is replete with misrepresentations, inaccuracies, and misleading statements and recitations of law.

7.      *First*, AJM is not merely a $48,000 creditor as the Debtor misrepresents.   In accordance with Sections 2(a) and 2(b) of the AJM/County Amendment (*See*, Dkt. No. 15, Exhibit "G"), AJM was assigned the Tax Deed Application and the County's Tax Lien was added to the AJM/County Agreement.

8.      Section 2 provides as follows:

"2.      <u>The Property</u>.

a.      Subject to the terms and conditions in this Amendment, the County hereby assigns and transfers all of its right, title, and interest in and to the Property's Tax Deed Application to AJM as of the Effective Date. This provision shall be self-operative and no further instrument shall be required to effectuate the assignment and transfer.

b.      As of the Effective Date, the Property's Tax Lien is hereby deemed added to Schedule A of the Agreement with all rights granted to AJM in the Agreement and in this Amendment. For the avoidance of doubt, such rights shall include, but not be limited to, the allocation of a Redemption of the Property's Tax Lien at any time on or after the Effective Date in accordance with the terms of the Agreement."

9.      Therefore, AJM is the current and lawful holder of the County's Tax Lien which, as of the Petition Date, has an outstanding balance of $3,269,099.22.  Together with AJM's other allowed undisputed secured claim, AJM holds secured claims against the Debtor and the Property totaling no less than $3,317,857.38, making AJM by far the largest secured creditor in the Chapter 11 Case.

10.     *Second*, the Debtor's attempt to dispute the validity of the County's Tax Lien is wholly without merit, as already preliminarily determined by the State Court.

11.     The foundation of the Debtor's rationale for why the Notice to Redeem served by the County regarding the County's Tax Lien is invalid is based upon the Debtor's incorrect claim that since subsequent taxes were added to the County's Tax Lien after the service of the Notice to Redeem, the County was required to service a new notice to redeem (thereby invalidating the initial Notice to Redeem) and it cites to Nassau County Administrative Code ("NCAC") § 5-51(j) in support.

12.     However, the Debtor blatantly misleads this Court to the extent that NCAC § 5-51(j) does **NOT** apply to (i) County held tax liens and (ii) subsequent taxes added to County held tax liens.  NCAC § 5-51(j), which requires a new notice to redeem to be served if subsequent taxes are added to the underlying tax lien following the initial service of a notice to redeem, applies **only** to third-party lien holders that pay subsequent taxes in accordance with NCAC § 5-49 and add such taxes to an existing third-party held lien following service of a notice to redeem.

**NCAC § 5-51(j)** – **If subsequent to the services of a notice to redeem as provided by this section, the holder of the certificate of sale, or the assignee of such certificate, shall pay any further taxes, in pursuance of section 5-49.0 of this code, which are not set forth in the notice to redeem served in accordance with this section, then such notice shall be deemed cancelled and the holder of the certificate, or the assignee thereof, shall be required to serve a new notice to redeem** in which such taxes shall be set forth together with such other information as shall be required by this code. (emphasis added)

**NCAC § 5-49** – **Payment by holder of certificate of sale; penalties thereon.**

1.  The holder of a certificate of sale of tax liens, at any time after the annual return of taxes to the County Treasurer by the receiver of taxes, may pay to the County treasurer any taxes on such return and any older taxes that are a lien on such property.

2.  The holder of such certificate making payment of such taxes shall entitled to and shall receive the full amount of the taxes thus paid with interest and penalties thereon from the date of payment at the same rate and payable in the same manner as the interest and penalties at which he purchased such tax lien.

3. The taxes, so paid by the holder of the certificate of sale of the tax lien, plus the interest and penalty at the maximum rate determined pursuant to §5-40, shall become a lien on the property and shall be payable at the time of the discharge of the certificate or sale of the tax lien or at the time of completion of foreclosure proceedings out of the proceeds realized at such sale of the property.

13.    Regarding the County's Tax Lien, the *County* was the tax lien holder and NCAC § 5-39(d) specifically provides for the County to "*automatically merge subsequent tax liens with tax liens previously sold to the County*" with no requirement to serve a new notice to redeem in such section or in NCAC § 5-51(j).

**NCAC § 5-39(d)** – Tax Liens, on any property on which the County holds a certificate of sale shall be excluded from any subsequent tax lien sale. **Such tax liens shall automatically merge with tax liens previously sold to the County** and shall bear maximum interest and penalties as set forth in section 5-40.0 and from the dates specified in section 5-11.0 and 5-23.0 of the chapter. (emphasis added)

14.    As such, the Notice to Redeem is valid and the Debtor's claims to the contrary have absolutely no merit.

15.    As succinctly and unequivocally stated in the State Court Decision in pertinent part, "*The Court finds the defendant County of Nassau is the Tax Lien holder and was permitted to merge subsequent Tax Liens.*" (*See*, Dkt. No. 15, Exhibit "J"). The impact of "law of the case" is discussed in the Joint Reply of the County of Nassau and AJM in the parallel Abstention Motion.

16.    The Debtor's State Court Action can therefore easily be disposed of through summary judgment and/or motion to dismiss under NY CPLR § 3211 or § 3212. There is therefore no need or legitimate purpose in this Court adjudicating the Debtor's duplicative Adversary Proceeding. *See*, for more discussion, *AJM's Response in Further Support of Motion to Dismiss or For Abstention of Adversary Proceeding* to be filed shortly hereafter.

17.    Accordingly, AJM is currently a bona fide secured creditor to the extent of no less than $3,317,857.38, with standing and rights afforded to a secured creditor under, inter alia, § 361,

§ 362, § 363, § 502, and § 506 of the Bankruptcy Code.

18.     *Third,* the Debtor's attempt to slander and defame AJM and, even more incredulously, the County and the Village, is nothing more than a desperate, bad faith diversionary tactic which has no relevance to the Debtor's Chapter 11 Case or the Motion at bar. Notwithstanding, the Court should be given a more accurate picture of the circumstances underlying AJM's agreements with the County and the Village and its bona fides lest the Court be given a blatant and reckless mischaracterization and misimpression by the Debtor.

19.     The AJM/County public-private partnership is nothing what the Debtor has characterized it to be, in what has indisputably been a tremendous success for AJM, the County, and the residents of the County.

20.     The chart below provides high level details on the two most recent bulk tax lien sales held by the County.  The RFP in 2008 was awarded to SDRJ Development Group ("SDRJ"), which is an affiliate of the Debtor via its "manager" and disguised principal, Sammy Habibian. The RFP in 2011 was awarded to AJM.  The intent of both RFPs was to offer certain previously uncollectible tax liens held by the County (some for as long as almost two decades) for sale at a discount as a means of encouraging a third party to step in to either recoup money for the County via payment of the tax liens or to restore the underlying properties to productive uses for the benefit of the communities in which they are located, and returned to the active tax rolls.

| Recent Nassau County Bulk Tax Lien Sales | | |
|---|---|---|
| | **2008 RFP** | **2011 RFP** |
| RFP Issue Date | June 16, 2008 | January 6, 2011 |
| RFP Title | Brownfield Real Property Tax Liens Sale/Assignment | Bulk Sale/Assignment of Real Property Tax Liens |
| RFP Awarded To | SDRJ Development Group[4] | AJM Capital II, LLC |
| Contract Date | April 20, 2009 | September 23, 2011 |
| Tax Liens Assigned | 16 | 1,050 |
| Estimated Collections to Date | $1,125,000[5,6] | $10,625,000 |

21.       Contrary to the Debtor's assertions, the initial public-private partnership between AJM and the County (represented by the AJM/County Agreement) and subsequently the AJM/County Amendment went through more stringent formal procurement and internal approval procedures that the County utilized for its approval procedures for the County's agreement with SDRJ (the "SDRJ/County Agreement").

22.       Additionally, the tri-party public-private partnership among AJM, the Village, and the County was developed because the Village and the County recognized that the tax liens greatly exceed the value of the Property and thus they arrived at a creative structure with mutually aligned interests of all the parties to unlock the fact that the Property is significantly 'under water' and facilitate the redevelopment of the Property which has been off of the active tax rolls for 30 years. Accordingly, the Village and the County spent considerable time and efforts (including formal procurement) to evaluate the company most qualified to redevelop the Property and that was AJM. The Debtor makes a number of unsubstantiated and false accusations regarding such tri-party public-private partnership. Although we will not waste this Court's time responding to each and

---

[4] On June 23, 2009, SDRJ made a political donation in the amount of $10,000 to Friends of Tom Suozzi, the then County Executive of the County.

[5] 7 of the 16 tax liens assigned to SDRJ were redeemed/paid.

[6] SDRJ obtained title to the underlying properties regarding the remaining 9 tax liens assigned to SDRJ. Since SDRJ's acquisition of such properties, which ranges from 2009-2011, SDRJ has not paid a penny of real estate taxes on such 9 properties, aggregating in the millions of dollars.

every one of them, it is important to clarify a few of them for the record:

- "*Only after the Debtor became the owner in March 2019 did AJM, the Village and the County act.*" (*See*, the Debtor's Supplemental Objection, ¶ 4). This is a blatant falsehood. The succeeding paragraphs provide for the timing of the formal procurement process that the County and the Village promulgated in connection with the Property which commenced five (5) years prior to the Debtor's acquisition. Additionally, the Debtor seems to rely heavily on the contents of a *Newsday* article that it included as an exhibit to the Debtor's Supplemental Objection. However, it curiously fails to mention or reference the *Newsday* article dated as of January 21, 2019 and titled, "*Developer proposes new use for Superfund site in Mineola*" which was published two (2) months before the Debtor acquired title to the Property. A copy of such article is annexed hereto as Exhibit "B".

- "*It appears that under the "creative" arrangement with AJM…that the County only gets paid in the event of a sale of the Property…There is no incentive for AJM to sell this Property if it ever gets the Property.*" (*See*, the Debtor's Supplemental Objection, ¶ 54). Although the Debtor seemingly has appointed itself as the party most qualified to evaluate the terms of such arrangement, the Debtor failed to review the AJM/County Amendment or the AJM/Village Agreement in their entirety. Had it done so, it would have uncovered in each agreement the provision that if AJM has not sold the Property after a date certain as set forth therein, AJM is obligated to buy out the respective interests of the County and the Village

10

subject to an appraisal.

- In the Debtor's Supplemental Objection, ¶ 42 and ¶ 43, the Debtor seeks to distinguish whether the Village has agreed to "*forbear*" or "*forgive*" the Village held Village tax liens pursuant to the AJM/Village Agreement. Rather than review the AJM/Village Agreement, as it speaks for itself, it relies on a quote from the Mayor in a *Newsday* article to make such distinction.

23.    With respect to the AJM/County Agreement, the County issued a Request for Proposals (the "Bulk Sale RFP") for the Bulk Sale/Assignment of Real Property Tax Liens (RFP# TR1228-1055) dated as of January 6, 2011 which offered a bulk sale of tax liens for sale at a discount as a means of generating revenue for the County. Some of such liens have been held by the County for many years, and have essentially been uncollectible and some of the underlying properties are perceived to have hazardous or toxic substance materials, pollutants, contaminants, and wastes present, on, under, or about the properties. AJM submitted a response to the Bulk Sale RFP on January 28, 2011. Following a number of meetings between AJM and representatives of the Nassau County Treasurer's Office to discuss AJM's response to the Bulk Sale RFP and the recommendation of the County's RFP Evaluation Committee, AJM was awarded the Bulk Sale RFP and was required to submit certain mandated disclosure declarations. Subsequently, the AJM/County Agreement, following protracted negotiations with representatives of the Municipal Transactions Bureau within the Nassau County Attorney's Office, was unanimously approved at public hearings held by (i) the Nassau County Legislature Finance Committee on September 12, 2011, (ii) the Nassau County Legislature Rules Committee on September 12, 2011, and (iii) nineteen (19) independently elected Legislators that comprise the Nassau County Legislature on

11

September 19, 2011 and became a resolution (Resolution #250-2011) on September 23, 2011.

Lastly, the AJM/County Agreement was executed on behalf of the County on September 23, 2011.

24.    With respect to the AJM/County Amendment, the County issued a Request for Proposals (the "First Jackson Steel RFP") for the Purchase and Redevelopment of Real Property – Premises:  Section 9, Block 672, Lot 4 – 435 First Street Mineola, NY (RFP# RE1117-1439) dated as of November 21, 2014.  AJM submitted a response to the First Jackson Steel RFP on December 15, 2014.  The County issued a subsequent Request for Proposals (the "Second Jackson Steel RFP") for the Purchase and Redevelopment of Real Property – Premises:  Section 9, Block 672, Lot 4 – 435 First Street Mineola, NY (RFP# RE0421-1610) dated as of April 22, 2016.  AJM submitted a response to the Second Jackson Steel RFP on May 23, 2016.   Following the recommendation of the County's RFP Evaluation Committee, AJM was required to submit certain mandated disclosure declarations,    Subsequently,  the AJM/County Amendment,  following protracted negotiations with representatives of the Municipal Transactions Bureau within the Nassau County Attorney's Office, was unanimously approved at public hearings held by (i) the Nassau County Legislature Finance Committee on May 6, 2019, (ii) the Nassau County Legislature Rules Committee on May 6, 2019, and (iii) eighteen (18) independently elected Legislators that comprise the Nassau County Legislature on May 20, 2019 and became a resolution (Resolution #63-2019) on May 24, 2019.  Lastly, the AJM/County Amendment was executed on behalf of the County on June 10, 2019.

25.    For details on the Village's procurement process which preceded the Village's decision to enter into the AJM/Village Agreement, *see* the Village's reply to the Debtor's Opposition to the Motion (ECF Doc. No. 44).

26.    The Debtor's unsupported and libelous allegations of political favoritism and even corruption reek of 'sour grapes' seemingly due to the fact that after the failed performance by SDRJ under the SDRJ/County Agreement, the County apparently decided to move on to a new vendor.  Such statements are unequivocally false, inflammatory and, most importantly, wholly irrelevant to the Debtor's Chapter 11 Case and the precarious position the Debtor has put its creditors in.  The Debtor attempts to deflect attention away from the substantive issues before this Court and draw AJM, the County, and the Village into some kind of side litigation packed with irrelevant and burdensome discovery – all part of the Debtor's scheme to further delay and harm creditors – and leading the Debtor into further administrative insolvency.  This is not a legitimate use of Chapter 11 and is in fact an improper one.

27.    Additionally, the Debtor's "cross-motion" to compel discovery is a nullity as it is neither permissible under the Local Bankruptcy Rules nor is a "cross-motion" even assuming cross-motions were permitted by the Court.  The Court should therefore ignore this request which is intended only to further harass and burden AJM.

28.    The "discovery" that the Debtor now seeks should have been undertaken as part of pre-purchase "due diligence" prior to its purchase of the Property from M.V. Barmed Realty by quitclaim deed dated March 7, 2019 for a nominal sum.  The nominal purchase price along with the description of the Property on the sale flyer (*See*, Dkt. No. 15, Exhibit "K") certainly suggest notice of the issues with respect to which discovery is sought.  By way of example, it's certainly puzzling why the Debtor is looking to AJM, the County, and the Village to produce documents

13

(that exist of public record) to educate the Debtor as to why the Property is not zoned to permit warehouse/industrial use.

29.    The Debtor seeks discovery in the context of a motion to lift the automatic stay under 11 U.S.C. § 362.  This is impermissible.  *See*, e.g. <u>In re Everton Aloysius Sterling</u>, 543 B.R. 385, 391 (Bankr. S.D.N.Y. 2015)("Mr. Sterling requests numerous items in discovery. But Mr. Sterling has not identified any legitimate issue of fact that would warrant discovery, and the Court will not permit him to seek discovery in these circumstances based on mere speculation."); <u>In re Flash</u>, No. 2019 WL 2895673, at *2 (D. Conn. Feb. 7, 2019)  ("A hearing associated with a motion to lift an automatic stay is meant to be quick and not a drawn-out adversarial affair. In fact, a bankruptcy court is not required to hold any hearing--much less a full evidentiary hearing—on a motion for relief from an automatic stay." *Global Cable, Inc. v. Adelphia Commc'ns. Corp. (In re Adelphia Commc'ns. Corp.*), 2006 U.S. Dist. LEXIS 37112, at *14-15 (S.D.N.Y. June 6, 2006) (internal citation omitted). "A motion for relief from stay filed in the Bankruptcy Court addresses only the issue whether the movant may pursue a claim in state or federal court to enforce its rights; it does not address or decide the merits of a claim.").  Debtor's discovery requests and demands are therefore impermissible, irrelevant, and only intended to harass the secured creditors and further forestall and delay them from exercising their legitimate rights.

30.    *Fourth*, the Debtor, who admits it has no intention or ability to reorganize, attempts instead to seduce this Court by submitting a non-binding, conditional offer to buy the Property, procured through an unauthorized broker (who in its offering memorandum may have inaccurately represented to the purchaser and other potential buyers current permitted uses pursuant to the Village's zoning code) who has not been retained by order of this Court, and whose retention has been objected to by multiple parties, for a mere $4 million – more than $2.5 million less than the

tax and mortgage liens on the Property, not even taking into consideration the potential EPA windfall lien which could be in the millions of dollars[7] and the response costs owed to NYSDEC.

31.     The contract redacts the identity of the purchaser, leaving this Court and all parties in the dark as to the bona fides of the purchaser to begin with.  More disturbingly, the contract is not a binding offer but merely a conditional option, giving the purchaser another 70 days at a minimum to decide whether its offer goes "hard".

32.     In addition, the contract is unclear on the purchaser's obligations to perform additional environmental remediation and is completely silent on its need to potentially assume the EPA windfall lien obligation and/or the reimbursement of NYSDEC response costs.  For those reasons, the contract in its current state is a nullity.

33.     Therefore, even assuming the purchaser satisfies its due diligence requirement and can somehow satisfactorily address the defects in the contract, the Debtor cannot even present this offer to the Court for another approximately 90-120 days.  The issue of the EPA potential windfall lien and NYSDEC response costs would further muddy the waters for other potential bidders and further cloud title.

---

[7] According to the EPA, the windfall lien is based upon the appreciation in value to the Property as a result of the EPA's "*substantial unreimbursed cleanup costs which EPA is unlikely to recover from liable parties*", pursuant to which it expended $8.3 million in public cleanup funds on the Property.  Additionally, the EPA states, "*But for EPA's expenditure of $8.3 million in public cleanup funds, Al Yega, LLC, would not be able to market the property for $4.5 million only months after a below-market acquisition from M.V. Barmed Realty, Inc., a liable owner previously thought to be defunct*" and "*Because this appears to satisfy a scenario in which EPA may perfect a windfall lien under the Windfall Guidance, EPA could potentially pursue such a lien as against Al Yega, LLC and, depending on the details of the transaction, a subsequent buyer as well*", further clouding title and compounding the Debtor's inability to sell the Property under §363(f).

34.     Additionally, the Debtor's purported ownership status of the Property as set forth in detail in the Motion further clouds title and the issue of whether the Debtor can deliver marketable title to a purchaser.  A title company would have to satisfy itself with the fact that, inter alia, a corporation dissolved for 26 years granted title to the Debtor[8], which conveyance in itself constituted a fraudulent conveyance under New York Debtor and Creditor Law 270, et. seq. Moreover, issues of authority of the signatory for the predecessor owner who executed the quit claim deed to the Debtor remain in question and dispute.  For all of the foregoing reasons, the Debtor's title remains clouded and uncertain, further diminishing the prospects to effectuate a sale in bankruptcy, assuming the Debtor could obtain authority to sell under § 363(f). The hurdles for a § 363 sale appear insurmountable.

35.     *Fifth*, while the Debtor proposes to remain in Chapter 11 on a seemingly endless time frame, the Property continues to lie in a dilapidated, unattended state, faced with mounting problems.  The Debtor admittedly has no income or resources to adequately maintain the Property and install the necessary soil vapor extraction system mandated by the EPA and the NYSDEC upon the Debtor's predecessor and now the Debtor as a matter of law.  *More disturbingly, the Debtor (a) fails to maintain adequate insurance for the Property and (b) is in post-petition arrears on the payment of real estate taxes.*

36.     Annexed hereto as Exhibit "C" are copies of the insurance[9] provided by the Debtor (i.e., Evidence of Property Insurance dated as of February 24, 2020 and the Insurance Binder dated as of February 14, 2020).  In sum, the coverages and limits are wholly insufficient to protect the interests of the secured creditors and the estate at large.  Upon a brief review of such provided

---

[8] See Exception Nos. 27 and 28 on Schedule B of the Certificate of Title (*See*, Dkt. No. 15, Exhibit "I").
[9] As admitted by the Debtor, it did not maintain insurance of any kind from the date of its acquisition of the Property up until the Petition Date until mandated to do so by the U.S. Trustee.

information, the following deficiencies were identified:

a.      The property insurance coverage provides a limit of $50,000 in building

value.

b.      There is no flood or earthquake coverage.

c.      There is no umbrella or excess liability coverage.

d.      The property policy is written with Basic Form (not Special Form) coverage

and Actual Cash Value (not Replacement Cost Value).

37.     The terms and coverages in (b), (c), and (d), lacking here, would be required by any
conventional lender to adequately protect its collateral.  Additionally, any newly bound insurance
policy is conditioned on a successful property inspection conducted by the insurance carrier; given
the condition of the building one must ponder whether this contingency has been satisfied.  Also,
there are a number of exclusions contained in the Debtor's policy which are listed in the Insurance
Binder but as same were not provided, it is unclear as to the full extent of what deficiencies exist
in such insurance coverage arising from such exclusions.

38.     Basically, this is the cheapest policy the Debtor could have selected and clearly
does not protect the secured creditors or the estate.  Based on the Debtor's own $6.5 million
valuation of the Property, by which it should be bound, the Debtor should be required to
*immediately* obtain property insurance covering $6.5 million in building value, which runs at an
approximate annual premium (utilizing the rate in the Debtor's insurance binder of $0.015 per
dollar of building value (i.e., $50,000 building value yields a premium of $750)), including general
liability which the Debtor's current policy has, of approximately $106,500.  In stark and blatant
contrast, the Debtor's current premium of $6,166 per annum, paid for by Asher Management

LLC[10], another affiliate of the Debtor, as a disguised unauthorized post-petition loan[11,12], reflects, inter alia, the gross underinsuring of the Property and the unauthorized post-petition loans are further indicia of the Debtor's gross mismanagement in the Chapter 11 Case and constitutes cause under 11 U.S.C. § 1112(b)(4)(B) and (C).

39.     More disturbingly, the Debtor has now fallen into arrears in the payment of post-petition real estate taxes – not a surprise given the Debtor and its predecessor's track record of nonpayment for more than 30 years and counting – adding to the Debtor's administrative insolvency which constitutes cause under 11 U.S.C. § 1112(b)(4)(A).

40.     Annexed hereto as Exhibit "D" is a schedule of the Debtor's delinquent post-petition real estate tax obligations.

41.     Despite the Debtor's inaccurate representations, the Debtor is in fact *currently* delinquent, on a pro rata, post-petition basis, in the payment of (a) 2019/20 2nd half school taxes in the pro-rated amount of $22,591.08, (b) 2020 1st half town taxes in the pro-rated amount of $6,916.67 and (c) 2019/20 Village taxes in the pro-rated amount of $6,343.00 for a total outstanding due in the aggregate amount of $35,850.75.

---

[10] The address for process listed with NYSDOS ties to one of the insiders of the Debtor.

[11] The Debtor's operating report for February, 2020 (*See*, Dkt. No 37, Page 2), filed six (6) weeks delinquently (which constitutes cause under 11 U.S.C. § 1112(b)(4)(C)), stated in pertinent part, "*Insurance payment…was paid by Asher Management LLC.  Asher Management LLC has no expectation of being paid back.*"  Curiously, almost a week later, the Debtor amended such filing to state that Asher Management LLC, rather than having "*no expectation of being paid back*", the Debtor "*has waived any claim to this advance*" (*See*, Dkt. No 41, Page 2).  Under any explanation, this constitutes an unauthorized post-petition loan to the Debtor.

[12] The Debtor's operating report for March, 2020 (*See*, Dkt. No 40, Page 2), filed several days delinquently, stated in pertinent part, "*Insurance payment in the amount of $103.77 was paid by Inwood Gate LLC.  Inwood Gate LLC has waived any claim against the Debtor for this payment.*"  Under any explanation, this also constitutes an unauthorized post-petition loan to the Debtor.

18

42.     Additional post-petition taxes for calendar year 2020 will become due in June (2020/21 Village taxes), July (2020 2nd half town taxes) and October (2020/21 1st half school taxes), in the estimated aggregate amount of $60,000, with the Debtor having no ability to pay those taxes as well.

43.     The Debtor's failure and inability to pay post-petition taxes constitutes gross mismanagement and cause under both 11 U.S.C. § 1112(b)(4)(I) and § 362(d)(1).

44.     *Sixth*, the secured creditors, for all of the reasons set forth above and in the Motion, are not being adequately protected.  The Debtor seeks additional delay through a likely impossible sale process combined with protracted spurious litigation, resulting in continued loss of compensation to the secured creditors without any possibility of reorganization or offer of providing adequate protection, an absolute condition to continuation of the stay in bankruptcy. *See*, inter alia, 11 U.S.C. § 361, § 362(d)(1), and § 363(c)(2).

45.     Annexed hereto as Exhibit "E" is a schedule of the secured claim amounts owed to AJM, the taxing authorities and the mortgagee, together with the amount of monthly interest that accrues on their respective claims.

46.     *The annual interest alone on these claims exceeds $1 million*, further eroding the estate, burying the Property further "under water", and irreparably harming the secured creditors.

47.     The Debtor admittedly cannot provide the secured creditors with adequate protection, and the estate is being eroded and made more administratively insolvent by the day with no possibility of rehabilitation or reorganization.  Meanwhile the Debtor seeks an unending course of litigation and nonfeasance, all the while offering no adequate protection or payment of post-petition real estate taxes, as before, while the Property likely continues to erode in value and the Property's condition continues to deteriorate to the direct material determent of the secured

creditors and the estate at large.

48.     Accordingly, it is respectfully submitted that the Court grant the Motion and either lift the stay or dismiss the Chapter 11 Case with prejudice.

49.     Since AJM fears the Debtor and its principals will pull another "stunt" and attempt to, inter alia, transfer the Property to a bankruptcy remote entity before the Tax Deed can be recorded, AJM prefers the Court lift the automatic stay and keep the Chapter 11 Case open.

50.     If for some reason the Court is not inclined to grant the Motion at this time, it is requested that the Court condition any continuance of the Chapter 11 Case and the automatic stay upon the following:

a)     The Debtor *immediately* obtains replacement or modified insurance coverage as follows:

    i.     The building limit on its property policy shall be increased from $50,000 to $6.5 million;

    ii.     Flood and earthquake coverage shall be added to its property policy;

    iii.     Umbrella liability insurance covering bodily injury and property damage with limits not less than $2 million per occurrence in excess of the Debtor's commercial general liability insurance shall be added to the policy; such umbrella coverage shall be follow form, written on an occurrence basis, and shall apply on a primary basis and non-contributing irrespective of any other insurance, whether collectible or not;

      iv.    The property policy shall be written on Special Form coverage (not Basic Form) and Replacement Cost Value (not Actual Cost Value); and

      v.    The policies as applicable shall name AJM, the County, the Village, and the mortgagee as additional insureds on the commercial general liability and umbrella liability policies and as loss payees on the property policy;

b)    Payment *immediately* of the $35,850.75 in delinquent post-petition real estate taxes;

c)    Payment *immediately* of $85,105.13[13] representing the first *monthly* adequate protection payment to the secured creditors, plus monthly payments of $85,105.13 continuing as long as the automatic stay remains in place; and

d)    Modify the stay and abstain on the Adversary Proceeding for a dispositive determination of the Debtor's dispute of the County's Tax Lien in the pending State Court Action.

51.    Absent the Debtor's complete and immediate compliance with the foregoing, AJM requests, for all the reasons stated above and in the Motion, the Court enter an order dismissing the Chapter 11 Case or lifting the stay.

---

[13] The interest rates set forth in Exhibit "E" reflect either contract or statutory rate of interest as applicable to each secured creditor's claim.

## **CONCLUSION**

For all the reasons set forth herein and in the Motion, AJM respectfully requests that the Court enter an order (i) dismissing the Debtor's Chapter 11 Case with prejudice against re-filing or, in the alternative, (ii) lifting, terminating or modifying the automatic stay, and grant AJM such other and further relief as may be just and proper.

Dated:  New York, New York
       May 4, 2020

                   Respectfully submitted,

                   DAVIDOFF HUTCHER & CITRON LLP
                   *Attorneys for AJM Capital II, LLC*

                   By: */s/ Robert Rattet*
                       Robert L. Rattet
                       Jonathan S. Pasternak
                       605 Third Avenue
                       New York, New York 10158
                       (212) 557-7200